1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BENJAMIN D. TERRITO,

        Plaintiff,                     No. CIV S-04-1460 MCE EFB P

    vs.

RICHARD W. SANDHAM, M.D.,
et al.,

        Defendants.              FINDINGS AND RECOMMENDATIONS
_____/

16       Plaintiff, a state prisoner without counsel, is suing under 42 U.S.C. § 1983 claiming
17 violations of his Eighth Amendment rights. He alleges that defendants, Drs. Sandham and
18 Roche, have repeatedly denied proper medication and diabetic snacks for plaintiff's Type I
19 (juvenile onset) Diabetes, resulting in plaintiff suffering hypoglycemic reactions, seizures and
20 brain damage. The matter is before the court on defendants' motion for summary judgment
21 which argues that there is no genuine issue about whether they were deliberately indifferent to
22 the plaintiff's medical needs.

23 I.     Defendants' Objections to Plaintiff's Evidence

24       Plaintiff styled his opposition to defendants' motion as a "declaration in opposition to
25 Defendant's Motion for Summary Judgment . . . ." Defendants object to that declaration to the
26 extent that it purports to state a medical opinion that he suffered diabetic seizures. Defendants

1

argue that plaintiff is not qualified to give such an opinion. *See* Fed. R. Ev. 702. The court does not accept the declaration for that purpose. Rather, the medical records speak for themselves and plainly establish the nature and severity of plaintiff's uncontrolled diabetes. However, plaintiff can properly testify to his own percipient experiences and symptoms as he perceives them. The court has reviewed his "declaration" and finds that plaintiff's references to "seizures" refer to specific episodes of severe low blood sugar levels that are supported by medical records and, in this regard, he is not offering an opinion but merely relying on what the record says. For this limited purpose, the declaration is admissible in opposition to the motion. Therefore, defendants' objection is overruled.

In support of his opposition, plaintiff attaches a letter from Steven Fama of the Prison Law Office to Tami Warwick of the Attorney General's Office containing a recitation of events and statements made by various people about plaintiff's medical care. Pl.'s Ex F-1. Defendants object to this letter as inadmissible hearsay. *See* Fed. R. Ev. 801, 802. Plaintiff relies on this letter to argue that defendants lack credibility. Plaintiff's Declaration in Opposition to Summary Judgment ("Pl.'s Dec.") at 5, 6. But the court cannot make credibility findings on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Therefore, the court will not consider the letter.

II.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[1] As the Ninth Circuit has explained, the utility of Rule 56 has been clarified and enhanced.

////

---

[1] On September 1, 2004, the court expressly informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988)

> In three recent cases, the Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the non-moving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis added). Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added). In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Grimes v. City and County of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson*, 477 U.S. at 248. A fact is "material" if it affects the right to recover under applicable substantive law. *Id.* at 248. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" that the moving party believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the movant does not bear the burden of proof on an issue, the movant need only point to the absence of evidence to support the opponent's burden.

////

1  To avoid summary judgment on an issue upon which the opponent bears the burden of proof, the
2  opponent must "go beyond the pleadings and by her own affidavits," or by the "'depositions,
3  answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is
4  a genuine issue for trial.'" *Id.* at 324.  The opponent's affirmative evidence must be sufficiently
5  probative that a jury reasonably could decide the issue in favor of the opponent. *Matsushita*, 475
6  U.S. at 588.  When the conduct alleged is implausible, stronger evidence than otherwise required
7  must be presented to defeat summary judgment.  *Id.* at 587.

8  Fed. R. Civ. P. 56(e) provides that "supporting and opposing affidavits shall be made on
9  personal knowledge, shall set forth such facts as would be admissible in evidence, and shall
10 show affirmatively that the affiant is competent to testify to the matters stated therein."
11 Nevertheless, the Supreme Court has held that the opponent need not produce evidence in a form
12 that would be admissible at trial in order to avoid summary judgment.  *Celotex*, 477 U.S. at 324.
13 Rather, the questions are (1) whether the evidence could be submitted in admissible form and (2)
14 "if reduced to admissible evidence" would it be sufficient to carry the party's burden at trial.  *Id.*
15 at 327.  Thus, in *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003), the opposing party's
16 reliance upon her diary was not inadmissible hearsay because the party could testify to all the
17 relevant portions from personal knowledge or read it into evidence as recorded recollection.

18 A verified complaint based on personal knowledge setting forth specific facts admissible
19 in evidence is treated as an affidavit.  *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995);
20 *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987).  A verified motion based on personal
21 knowledge in opposition to a summary judgment motion setting forth facts that would be
22 admissible in evidence also functions as an affidavit.  *Johnson v. Meltzer*, 134 F.3d 1393, 1439-
23 1400 (9th Cir. 1998); *Jones v. Blanas*, 393 F.3d 918, 922 (9th Cir. 2004).

24 Defects in opposing affidavits may be waived if no motion to strike or other objection is
25 made.  *Scharf v. United States Attorney General*, 597 F.2d 1240, 1243 (9th Cir. 1979)
26 (incompetent medical evidence).

III.     Facts

At all times relevant to this action, defendants Sandham and Roche were, respectively, the Chief Medical Officer and the Chief Physician and Surgeon at High Desert State Prison. Plaintiff was confined at HDSP from March 26, 2002, until March 9, 2005. He currently is confined at Corcoran State Prison.[2]

Plaintiff has had Type I Diabetes[3] since he was about four years of age. Pl.'s Ex A-3. On March 6, 2002, prison officials enrolled plaintiff in the Diabetic Chronic Care Program.[4] Declaration of Roche ("Roche Dec.") at 2; Declaration of Sandham ("Sandham Dec.") at 2. Plaintiff ate all of his meals, regularly snacked and usually had oral glucose paste in his cell.

From May 2002 through April 2003, plaintiff experienced many hypoglycemic[5] episodes that landed him in the medical clinic, mostly on an emergency basis. On May 1, 2002, at around 2:20 a.m., plaintiff's blood sugar was 54 mg/dL, and he was diagnosed as having had a "seizure episode" in his cell. Pl.'s Ex. E-1. On May 10, 2002, at 1:25 a.m., plaintiff's blood sugar dropped to 53 mg/dL and he was diagnosed as having had a diabetic seizure during which he had bitten his tongue. Pl.'s Ex. E-2. On November 26, 2002, at 2:00 p.m. plaintiff was admitted to

---

[2] Plaintiff was transferred to a different facility and is under the care of different physicians who have prescribed Lantus, and nothing in the record suggests he could be transferred back under the care of defendants. Therefore, his request for injunctive relief is moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368-1369 (9th Cir. 1995).

[3] Also known as "insulin dependent diabetes," this condition results from the body's inability to produce insulin sufficient to metabolize sugars and is characterized by wide, sometimes unpredictable variations in blood sugar levels. *Dorland's Illustrated Medical Dictionary*, p. 460 (27th ed. 1988).

[4] Defendants do not explain this program.

[5] Hypoglycemia is "an abnormally diminished concentration of glucose in the blood." *Dorland's Illustrated Medical Dictionary*, p. 804 (27th ed. 1988). It can cause cold sweat, tremulousness, headache, irritation and convulsions. *Id.* According to the National Institutes for Health, a diabetic is hypoglycemic if the blood sugar level is 70 mg/dL or lower. *See* National Diabetes Information Clearinghouse, http://diabetes.niddk.nih.gov/dm/pubs/dictionary/K-O.htm#M. "Mg/dL," signifies "milligrams per deciliter," according to the National Institutes for Health. *See* National Diabetes Information Clearinghouse, http://diabetes.niddk.nih.gov/dm/pubs/dictionary/K-O.htm#M

the emergency clinic with a blood sugar of 57 mg/dL, and was noted to be a "known diabetic on insulin," who "developed a reaction[6] a few minutes ago." Pl.'s Ex. E-3.  On December 23, 2002, plaintiff was admitted to the clinic at 10:40 p.m. for having low blood sugar.  Pl.'s Ex.t E-4.  Medical staff gave him three glucose gels to elevate his blood sugar level and discharged him.  Pl.'s Ex. E-4.  On December 31, 2002, at 3:30 a.m., plaintiff reported having had a seizure and was admitted to the emergency clinic.  Pl.'s Ex. E-5.  At the time of admission, his blood sugar was 82 mg/dL.  Pl.'s Ex. E-5. He had not taken glucogen.  Pl.'s Ex. E-5.  On February 13, 2003, Dr. Naku noted plaintiff's hypoglycemia, altered his insulin dosage in an attempt to avoid hypoglycemic episodes, and advised plaintiff about diet and exercise.  Defs.' Ex. A.  That night, plaintiff was admitted to the emergency clinic at around 10:00 p.m. with a blood sugar level of 67 mg/dL.  Pl.'s Ex. E-6.  He reported that he felt his blood sugar level decreasing at around 11:00 a.m., took glucose gel and fell asleep.  Pl.'s Ex. E-6.  On March 23, 2003, he was admitted to the emergency clinic at 11:55 p.m. with a blood sugar level of 85 mg/dL.  Pl.'s Ex. E-7.  Plaintiff did not recall eating dinner or what happened that evening, but reported a seizure.  Pl.'s Ex. E-7.  Correctional officers did not have glucose gel that night.  Pl.'s Ex. E-7.  The nurse determined plaintiff bit his tongue.  Pl.'s Ex. E-7.  On April 9, 2003, at 12:50 a.m., plaintiff again was admitted to the emergency clinic for having had a diabetic seizure during which he bit his tongue.  Pl.'s Ex. E-8.  Plaintiff reported eating dinner and taking insulin earlier that evening.  Pl.'s Ex. E-8.

On May 8, 2003, Dr. James noted that plaintiff had very long standing juvenile diabetes.  He noted that plaintiff had been having "severe hypoglycemic reactions at night, despite adjustment of insulin doses."  Pl.'s Ex. A-1.  Dr. James also noted that under the current medical regime, plaintiff was "having poor control of his diabetes and insulin reactions."  *Id.*  Of

---

[6] An insulin reaction occurs when the blood sugar level is too low (at or below 70 mg/dL). National Diabetes Information Clearinghouse, http://diabetes.niddk.nih.gov/dm/pubs/dictionary/F-J.htm#I.

significance here, Dr. James noted that he would attempt to obtain Lantus or Glargine[7] for plaintiff.  Pl's Ex. A-1.

On May 20, 2003, Dr. Mangis entered a notation that states: "with [plaintiff's] knowledge base, it seems unusual that he would have so many hypoglycemic events.  Wonder about underlying intent."  Pl.'s Ex. C-2.  Countering the hypoglycemic events from the regular insulin peaking at night was an apparent concern, as Dr. Mangis included the notation "I am trying to work getting  peanut butter in the diabetic nourishment bags to provide extra protein for [inmates] to have on hand."  Pl.'s Ex. C-2.

On May 22, 2003, a dietician noted that plaintiff had been in the emergency room for hypoglycemic seizures at least 17 times in the previous 12 months.  The dietician noted that plaintiff was "well versed" on the requirements of a diabetic, wanted more food and Glargine, and had "quite a [sic] aerobic work-out routine that may lead to hypoglycemia."  Defs.' Ex. A. On July 21, 3003, Dr. James noted that during the preceding night, plaintiff's blood sugar was "in the 40s," determined plaintiff was having hypoglycemic reactions from his insulin and decreased plaintiff's evening insulin dosage.  Defs.' Ex. C.

On July 15, 2003, and on September 12, 2003, prison health care professionals noted plaintiff engaged in "health seeking behavior."  Pl.'s Ex. B.

On August 7, 2003, Dr. Rohlfing diagnosed plaintiff with "Brittle diabetes[8] w/episode of hypoglycemia at 2:00 a.m."  Significantly, following the above history of brittle and uncontrolled Type I diabetes, Dr. Rohlfing prescribed Lantus as part of plaintiff's insulin schedule, to be commenced once the medication was approved and available.  Pl.'s Ex. A-2, A-7. Dr. Rohlfing, as the prescribing physician, completed a form requesting that the pharmacy

---

[7] Lantus is the brand name of insulin glargine, a long-acting blood sugar lowering agent. *Physicians' Desk Reference*, p. 715 (59th ed. 2005).

[8] "Brittle diabetes" is a condition in Type 1 Diabetics in which there are "frequent, rapid swings in glucose levels without apparent cause." *Merck Manual*, p. 173 (17th Ed. 1999).

7

acquire Lantus for plaintiff's treatment. However, on August 19, 2003, someone from Dr. Sandham's office signed the bottom of the form refusing the request. The portion of the form labeled "reason for disapproval" was left blank. Pl.'s Ex. A-7. The signature on this form is nearly illegible, but it is consistent with and indeed matches the signature on the declaration of Dr. Roche. Accordingly, it appears that Dr. Roche singed the August 19, 2003, decision to deny Lantus. *See also* Roche Dec. at ¶ 20.

On August 18, 2003, Dr. Lamer, despite plaintiff's behavioral problems, determined that the NPH insulin, administered to plaintiff at 7:30 p.m., generally took effect within one to two hours and peaked between 2:00 a.m. and 4:00 a.m. To avoid the peaking and resultant hypoglycemia, Dr. Lamer requested that plaintiff be treated with Glargine because it takes effect within four to six hours, and peaks sometime after 6-24 hours. Defs.' Ex. C to Phillips Dec., sixth unnumbered page. On August 19, 2003, this request was denied. Defs.' Ex. C to Phillips Dec. Again, the signature of the physician denying the request is nearly illegible, but appears to match that of Dr. Roche's declaration. Thus, it appears that Dr. Roche also signed the August 19, 2003, decision to deny Dr. Lamer's August 18, 2003, request.

On September 17, 2003, yet a third physician, Dr. Mangis, concluded that a "non-peaking" insulin was necessary to minimize plaintiff's hypoglycemic episodes. Pl.'s Ex. A-3. Dr. Mangis' entries include "[t]his patient needs to be on a non-peaking insulin such as Ultra Lente or Glargine." Dr. Mangis further noted that "[t]he long acting insulin definitely would be best." *Id.*

On October 30, 2003, plaintiff requested a diabetic snack. Pl.'s Ex. C-1. The request was denied on November 6, 2003. Pl.'s Ex. C-1. On February 26, 2004, plaintiff requested an extra sandwich because of his diabetes and the request was denied on March 11, 2004. Pl.'s Ex. C-1.

On January 14, 2004, at 10:00 a.m., plaintiff was admitted as an inpatient to the Correctional Treatment Center at HDSP to determine whether plaintiff was manipulating his

8

blood sugar levels. Defs.' Ex. D to Phillips Dec. Upon admission, a dietician evaluated plaintiff and placed him on a controlled diet of 2400 calories per day, monitored his exercise and prohibited him from keeping food in his cell. Defs.' Ex. D to Phillips Dec. They closely monitored plaintiff's blood sugar and insulin injections and they limited his access to glucose gel. *Id*.

On January 14 at 9:00 p.m., plaintiff's blood sugar was 70 mg/dL and plaintiff was given glucose gel. At 10:00 p.m., plaintiff's blood sugar level was 55 mg/dL and he was given glucose gel. *Id*. At 12:20 a.m. on January 15, plaintiff's blood sugar was 49. By 1:00 a.m., his blood sugar was 210 mg/dL.

Later on January 15, 2004, plaintiff rejected medical care, stated he wanted to return to the general population because CTC personnel were not helping him and threatened that if he was not returned to the general population "there would be casualties." *Id*. That same day, prison staff discovered two springs missing from plaintiff's mattress. *Id*. One was on the floor stretched beyond repair and the other was inside or near his pillow. *Id*. Plaintiff was moved to a "cement pad mattress room." *Id.*

Plaintiff told medical staff that he would require Lantus while in general population regardless of the controlled atmosphere in CTC. *Id*. Plaintiff emphasized that in general population, he consumed around 3,600 calories a day and worked to maintain a low body-fat percentage. *Id*. On January 18, a physician concluded plaintiff would not benefit from remaining in the CTC because he "persists in focusing on body building and diet and exercise manipulation over D.M. stabilization," and plaintiff was discharged from the CTC. *Id*.

Medical personnel at the Substance Abuse Treatment Center at Corcoran now treat plaintiff's diabetes at least in part with Lantus. Pl.'s Dec. at 6.

IV. <u>Analysis</u>

Plaintiff asserts that defendants knew that the only way to control his diabetes was by prescribing Lantus and permitting plaintiff to have diabetic snacks to counter low blood sugar

9


1  episodes from insulin shocks, but deliberately refused that treatment in favor of a regime that
2  was known to be failing to control the diabetes. Defendants assert that there is no genuine issue
3  about whether they were deliberately indifferent.[9]

4  Prison officials violate the Eighth Amendment when they engage in "acts or omissions
5  sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v.*
6  *Gamble*, 429 U.S. 97, 106 (1976). A prison official is deliberately indifferent when he knows of
7  and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."
8  *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).
9  The official must "be aware of the facts from which the inference could be drawn that a
10 substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S.
11 at 837. Deliberate indifference "may be manifested in two ways. It may appear when prison
12 officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the
13 way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d
14 390, 394 (9th Cir. 1988). When prison medical personnel act based on "a medical judgment that
15 either of two alternative courses of treatment would be medically acceptable under the
16 circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson*
17 *v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996). Prison officials provide constitutionally
18 inadequate care when they know that a particular course of treatment is ineffective, but they do
19 not alter it in an attempt to improve treatment. *See Jett v. Penner*, 439 F.3d 1091, 1097-1098
20 (9th Cir. 2006).

---

[9] In their reply to plaintiff's opposition, defendants also assert that without expert opinion, plaintiff cannot demonstrate he has a serious medical need. Defendants rely primarily on California medical malpractice cases. A serious medical need for Eighth Amendment purposes is a medical condition that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment or chronic and substantial pain. *See*, e.g., *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*). Type I (insulin dependent) Diabetes requires ongoing monitoring and treatment and indisputably constitutes a serious medical need.

1          Here, it is undisputed that the defendants were well aware of medical records that plainly
2   document plaintiff's history of uncontrolled insulin reactions at night, which resulted in blood
3   sugar levels that were unacceptably low.  These records are replete with plaintiff's well
4   documented complaints of losing consciousness, falling and bumping his head, seizures, etc.
5   Although the declarations of Drs. Sandham and Roche quarrel with whether any medical staff
6   actually observed a "seizure," plaintiff's blood sugar levels are documented and undisputed.
7   Among the levels showing insulin reactions are: 54 ( May 1, 2002, at 2:20 a.m.),  53 (May 1,
8   2002, at 2:20 a.m.), 53 (May 10, 2002, at 1:25 a.m.), 57 (November 26, 2002, at 2:00 p.m.), 67
9   (February 13, 2003, at 10:00 p.m.), "in the 40s" (July 21, 3003), 70 (January 14, 2004 at 9:00
10  p.m.), 55 (January 14, 2004 at 10:00 p.m.), 49 (January 15, 2004 at 12:20 a.m.).  These levels are
11  expressed in mg/dL.  An insulin reaction occurs when the blood sugar level is too low (at or
12  below 70 mg/dL).  National Diabetes Information Clearinghouse,
13  http://diabetes.niddk.nih.gov/dm/pubs/dictionary/F-J.htm#I.  Defendants' declarations do not
14  dispute this.  Neither do they dispute the effect of an insulin reaction on the body, or the
15  consequences of failing to control such reactions.  Significantly, they do not deny knowledge of
16  this information and the risk of harm in failing to stabilize uncontrolled insulin reactions.
17  Indeed, given the expertise claimed by Drs. Sandham and Roche in the first three paragraphs of
18  their respective declarations, any such denial would be implausible.
19         Furthermore, neither Dr. Sandham nor Dr. Roche denies responsibility for refusing the
20  treatment that four other treating physicians determined was necessary to control plaintiff's
21  diabetes and insulin reactions.  Sandham Dec. at ¶ 20 ("As Chief Medical Officer/Health Care
22  Manager I had the final say as to whether an inmate would receive a non-formulary
23  medication."); Roche Dec. at ¶ 23 ("The Chief Physician and Surgeon and the Chief Medical
24  Officer have the final say as to whether an inmate would receive a non-formulary medication.").
25  Indeed, they did have the final say.  Dr. James expressly noted the need for Lantus or Glargine,
26  and indicated he would attempt to obtain it for plaintiff.  Dr. Rohlfing specifically prescribed

Lantus, but Dr. Sandham's office, through Dr. Roche, overruled the prescription, leaving blank the portion of the form labeled "reason for disapproval." Dr. Lamer also expressly recommended Glargine for plaintiff, but Dr. Sandham's office, again through Dr. Roche, overruled that recommendation. Dr. Mangis, in quite pointed language, concluded that a "non-peaking" insulin was necessary to address plaintiff's repeated hypoglycemic episodes. He states that "[t]his patient needs to be on a non-peaking insulin such as Ultra Lente or Glargine." Pl.'s Ex. A-3. These four treating physicians based their conclusions on a well-documented history in which the alternative, on which defendants insisted, demonstrably had failed to control the reactions from the short term peaking insulin. Finally, it is significant that medical personnel at Corcoran now treat plaintiff's diabetes at least in part with Lantus.

Granted, plaintiff appears from the medical records to be a difficult patient. Moreover, overseeing medical care in a prison institution presents unique challenges and problems. However, the evidence presented shows that Dr. Sandham deliberately withheld medical treatment that four experienced treating doctors determined was necessary to stabilize a well-documented case of uncontrolled Type I diabetes and attendant insulin reactions. A reasonable fact finder could conclude from this evidence that defendants knew of and disregarded a risk of injury or harm to plaintiff from uncontrolled diabetes and repeated insulin reactions by withholding the long term, non-peaking insulin that four treating physicians had been found to be medically necessary.

Moreover, a reasonable fact finder could, on this record, find that the deliberate withholding of nutrition needed to promptly raise the plaintiff's blood sugar at the initial stages of an insulin reaction constitute a deliberate disregard of the risk of injury or harm from uncontrolled insulin reactions. A deliberate decision was made to withhold non-peaking insulin. Yet, plaintiff's requests for food items needed to counter an insulin reaction from peaking insulin were also refused. Ingesting food at the onset of a reaction (assuming he is awake and feels the symptoms of low blood sugar) before loss of consciousness seems to have been plaintiff's only

alternative. Dr. Mangis appears to have recognized this in his May 22, 2003, notation that, "I am trying to work getting peanut butter in the diabetic nourishment bags to provide extra protein for [inmates] to have on hand." Pl.'s Ex. C-2. But plaintiff's October 3, 2003, and February 26, 2004, requests for a diabetic snack were denied. Pl.'s Ex. C-1.

On one hand, defendants assert that plaintiff wanted Lantus and snacks in order to continue an exercise regime which facilitated the maintenance of a low body-fat percentage. Yet, on the other they argue that plaintiff used food consumption and exercise to manipulate prison physicians into prescribing Lantus and snacks. Defendants confuse cause and effect. The undisputed facts show that on May 8, 2003, Dr. James recommended Lantus after noticing plaintiff's history of late-night hypoglycemic episodes and finding plaintiff was having insulin reactions. Similarly, on August 7, August 18, and September 17, 2003, three other physicians recommended that plaintiff be prescribed Lantus or some other non-peaking insulin. Plaintiff began requesting Lantus around January 15, 2003. There is no evidence plaintiff knew of or requested Lantus before the recommendations of these physicians. In sum, a symptom of plaintiff's diabetes precipitated these physicians' recommendation of Lantus, and only after Lantus was denied did plaintiff request it. Plaintiff is entitled to an inference that he did not manipulate the hypoglycemic episodes occurring either before or after the recommendation of Lantus.

Similar reasoning holds for the diabetic snacks. The undisputed facts show that plaintiff generally had access to extra meals and canteen snacks (although it is not clear when he ate them), but still suffered late-night hypo-glycemic episodes. Thereafter, a dietician and Dr. Mangis recommended diabetic snacks, which defendants refused to permit. There is no evidence that plaintiff requested diabetic snacks before these recommendations. Plaintiff is entitled to an inference that he did not manufacture the hypoglycemic episodes either before or after the recommendations that he have diabetic snacks.

////

1       With respect to plaintiff's preoccupation with physical fitness and food consumption and
2  the effects thereof on his blood sugar levels, the undisputed facts show that prison medical staff
3  found plaintiff engaged in "health seeking behavior," and that plaintiff's preoccupation pre-dated
4  any recommendation that he take Lantus or that he receive extra diabetic snacks.  The evidence
5  also shows that Dr. Mangis, while questioning plaintiff's "motives," for having hypoglycemic
6  episodes, nevertheless recommended that plaintiff be prescribed a non-peaking insulin.  It also is
7  undisputed that another physician made a clinical finding, i.e., plaintiff suffers from "Brittle
8  Diabetes," which might explain the symptom which precipitated the recommendation of Lantus.
9  Defendants have not adduced any evidence about plaintiff's eating habits or physical fitness
10 regimen that would connect them to plaintiff's hypoglycemic episodes.  Nor do they adduce any
11 evidence to explain why plaintiff had such an episode after being admitted to the CTC, or why
12 plaintiff, cantankerous and demanding about his health, repeatedly would subject himself to the
13 ill-effects of hypoglycemia.

14      Setting aside the consensus over the importance of diet and exercise as a means of
15 controlling diabetes, the genuine dispute here, if there be one, centers on defendants' credibility
16 given the evidence that four other physicians unmistakably were of the opinion that plaintiff
17 required a long term non-peaking insulin.  Dr. Sandham, and apparently Dr. Roche who also
18 served as a Health Care Manager, vetoed all four treating doctors.   Drs. Sandham and Roche
19 state in their declarations that "[w]hile [plaintiff] was able to convince a couple of doctors to
20 suggest the Glargine/Lantus, based on objective findings and his time in the CTC, I did not see
21 this to be medically necessary."  Sandham Dec. at ¶ 19; Roche Dec. at ¶ 20.

22      Since four different doctors prescribed Lantus, Glargine, or a non-peaking insulin in
23 general, this is not a case in which plaintiff merely disagrees with his treatment.  *See Jett*, 439
24 F.3d at 1098.  To the contrary, the alternative to prescribing a non-peaking insulin that Drs.
25 Sandham and Roche adhered (overruling the treating doctors) repeatedly and demonstrably
26 failed to properly control plaintiff's insulin reactions.  That fact is well-documented in the

medical records. Drawing all reasonable inferences in plaintiff's favor, the court finds that a reasonable jury could find defendants knew the care provided was inadequate, but failed to attempt to provide an effective treatment. Defendants therefore are not entitled to judgment as a matter of law.

Accordingly, it is hereby RECOMMENDED that:

1. Defendants' March 13, 2006, motion for summary judgment be denied;

2. Plaintiff be given 30 days to file a pretrial statement;

3. Defendants be directed to file a pretrial statement 15 days thereafter.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 31, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE